UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------- x

JOSEPH CARUSO,

                               Plaintiff,

              -against-

CITY OF HARTFORD,

                             Defendant.

------------------------------------------------------------- x

**MEMORANDUM & ORDER**

3:22-CV-1391 (VDO)

**VERNON D. OLIVER**, United States District Judge:

Plaintiff Joseph Caruso, formerly an employee of Defendant City of Hartford ("the City"), brings this action claiming, in Count One, violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; in Count Two, discrimination based on his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; in Count Three, hostile work environment in violation of the ADA; in Count Four, failure to accommodate in violation of the ADA; in Count Five, retaliation in violation of the anti-retaliation provisions of 42 U.S.C. § 12101 *et seq.*; in Count Six, discrimination, failure to accommodate and retaliatory discharge in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.*; and in Count Seven, retaliation and interference in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Before the Court is the City's motion for summary judgment under Federal Rule of Civil Procedure 56. For the following reasons, the motion for summary judgment is **granted in part and denied in part**.

I.    **BACKGROUND**

A.    **Factual Background**

The following facts are taken from the City's Local Rule 56(a)1 Statement of Undisputed Material Facts ("Def.'s 56(a)"),[1] the Second Amended Complaint ("SAC"),[2] and the record. In his Local Rule 56(a)2 Statement ("Pl.'s 56(a)"),[3] Plaintiff did not include a separate section containing additional facts not previously set forth in the City's 56(a)1 Statement. The facts below are recounted "in the light most favorable to" Plaintiff, the non-movant. *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 354 (2d Cir. 2021). The facts as described below are in dispute only to the extent indicated.

Joseph Caruso was hired by the City of Hartford's Internal Audit Commission ("IAC")[4] as an Internal Audit Department ("IAD") Auditor on June 1, 2010.[5] At that time, Craig Trujillo was also employed in the IAD as the Deputy Chief Auditor.[6]

In November 2017, Trujillo was promoted to Chief Auditor.[7] Trujillo recommended to the IAC that they fill his former position as Deputy Chief Auditor by promoting Plaintiff.[8] The

---

[1] ECF No. 78.

[2] ECF No. 20.

[3] ECF No. 99-1.

[4] The Court notes some confusion regarding the name of the Commission. Plaintiff refers to the Commission as the *Independent* Audit Commission in paragraphs two, four, and five of his Amended Complaint. He also refers to it as the *Internal* Audit Commission in paragraphs ten and eleven. Hartford's Municipal Code, in relevant part, refers to the Commission as the *Internal* Audit Commission. *See* Municipal Code § 2-41(a) ("There shall be an internal audit commission.").

[5] SAC ¶ 4.

[6] Pl.'s 56(a) ¶ 2.

[7] *Id.* ¶ 3.

[8] *Id.* ¶ 4.

IAC did so.[9] Following their promotions, Plaintiff says that his relationship with Trujillo was "mostly good," but that Trujillo would do things that made Plaintiff "shake [his] head."[10] Over time, Plaintiff's relationship with Trujillo soured, and he eventually began to experience chest pain and anxiety attacks from internalizing his work-place stress.[11]

### 1.    Caruso's First Two Complaints to Human Resources

A little more than two years after being promoted, on February 25, 2020, Plaintiff complained orally to Human Resources about Trujillo.[12] Trujillo had reportedly called an audit report submitted by one of the IAD's auditors "shit."[13]

Plaintiff also told HR staff that Trujillo had "created a toxic atmosphere in the Internal Audit Department by intimidating staff, retaliating against individuals he perceive[d] to have slighted him, inappropriate behavior and time theft."[14] Among other things, Plaintiff complained that Trujillo called an IAC member a "f*** asshole," gave information to another IAC member who in turn leaked that information to media outlets, spent a considerable amount of time watching Fox News or YouTube videos on the office whiteboard, falsified his timecards, and left the office bathroom door open while urinating.[15] Plaintiff also expressed

---

[9] *Id.*

[10] Pl.'s Dep., ECF No. 77-3 at 34:10–14. (Citations to depositions are to the pagination of the transcript and line numbers as opposed to the ECF header)

[11] *Id.* at 42:3–9.

[12] Pl.'s 56(a) ¶ 7.

[13] Pl.'s 56(a) ¶ 7; Pl.'s Dep. at 43:16–18.

[14] Pl.'s First HR Complaint, ECF No. 77-4 at 2.

[15] *Id.* at 2–3.

that he was "fearful for his job and fear[ed] retaliation once Mr. Trujillo finds out that a complaint has been filed."[16] Plaintiff did not complain of discrimination.[17]

After making that complaint, Plaintiff was advised by HR staff to go home for the rest of the day and go on FMLA leave if necessary.[18] Plaintiff went home that day, and he did not come in the next day.[19]

Two days after making his first complaint, on February 27, 2020, Plaintiff returned to work and made a second complaint to HR about Trujillo.[20] Plaintiff told HR staff that he perceived Trujillo's actions as "threatening, harassment, retaliation, and misconduct related to time theft."[21] Like his first complaint, Plaintiff did not mention discrimination in his second complaint to HR.[22] After making this second complaint, Plaintiff again went home early.[23]

### 2.    Caruso's Leave of Absence

On February 28, 2020, Plaintiff met with his physician, Dr. Edelheit.[24] Following the visit, Plaintiff submitted a request for FMLA leave to the City's Benefits Administrator, Rich Pokorski.[25] On the FMLA leave request form, when prompted to describe other medical facts related to Plaintiff's condition, Dr. Edelheit wrote "toxic stressfull [sic] work envirment [sic]

---

[16] *Id.* at 3.

[17] Pl.'s 56(a) ¶ 12.

[18] *Id.* ¶ 8.

[19] *Id.* ¶ 9.

[20] *Id.* ¶ 10.

[21] Pl.'s Second HR Complaint, ECF No. 77-5.

[22] Pl.'s 56(a) ¶ 12.

[23] *Id.* ¶ 11.

[24] Pl.'s Dep., ECF No. 77-3 at 163:17–19.

[25] Pl.'s 56(a) ¶ 15.

. . . Reach the point that pt does not feel he can be effective in the office with current supervisor. . . . when supervisor leaves, pt can return to work."[26] Dr. Edelheit recommended that Plaintiff take a full leave of absence through March 31, 2020, and then work half days from April 1, 2020, to May 1, 2020.[27] Plaintiff's FMLA leave request was approved; thus, Plaintiff was on full leave from February 28, 2020, to March 26, 2020.[28]

When he returned on March 26, Plaintiff worked mostly remotely.[29] He resumed his usual duties except for his work on the audit reports that Trujillo managed while Plaintiff was on leave.[30]

### 3.    The City's Investigation of Caruso's First and Second Complaints

After receiving Plaintiff's February 25 and February 27 complaints, the City retained Rose Kallor, LLP to investigate Plaintiff's allegations.[31] Attorney Melinda A. Powell from the firm conducted the investigation.[32] In the course of her investigation, Attorney Powell interviewed Plaintiff and each of the three IAD Auditors.[33] She also reviewed communications between Plaintiff and Trujillo.[34]

---

[26] Pl.'s FMLA Request Form, ECF No. 77-6 at 3.

[27] Pl.'s 56(a) ¶ 14.

[28] *Id.* ¶ 24.

[29] *Id.* ¶ 26.

[30] *Id.* ¶¶ 33, 34.

[31] *Id.* ¶ 19.

[32] *Id.* ¶ 20.

[33] *Id.*

[34] *Id.*

On June 1, 2020, Attorney Powell issued a report of her investigation into Plaintiff's February complaints.[35] Attorney Powell concluded that, although Plaintiff's complaints had made out prima facie showings of a hostile work environment and retaliation by Trujillo, "[n]o violation of [the] City's EEO, anti-harassment or anti-retaliation policies . . . occurred," and "there was no evidence presented or concerns raised about any gender, race, or other discrimination based on protected status."[36]

### 4. Caruso's Third Complaint to Human Resources and the City's Second Investigation

Eight days after Attorney Powell issued her report, on June 9, 2020, Plaintiff filed a third complaint about Trujillo with Human Resources.[37] In it, Plaintiff complained of several instances that he believed constituted retaliation by Trujillo.[38]

First, Plaintiff claimed that, while he was on leave, Trujillo told the other IAD members that Trujillo would be "taking over all the admin work" when Plaintiff returned.[39] Trujillo "implied that he would be treating [Plaintiff] like the rest of the audit team in terms of work responsibilities."[40] Plaintiff said that he felt "this was an attempt to minimize [his] importance to the team and to embarrass [him]."[41]

---

[35] *Id.* ¶ 29.

[36] Powell Report, ECF No. 77-9 at 8–9.

[37] Def.'s 56(a) ¶ 30.

[38] Pl.'s Third HR Complaint, ECF No. 77-10 at 2.

[39] *Id.*

[40] *Id.*

[41] *Id.*

Second, Plaintiff complained that, when he returned from leave, Trujillo told Plaintiff that "[a]ll audits and reports in progress" would be managed by Trujillo, and that Plaintiff did "not need to be involved in them."[42]

Third, Plaintiff complained that Trujillo was reluctant to give him access to the Department's "P-card," which would allow for Plaintiff to make purchases for the IAD with City funds.[43]

Fourth, Plaintiff complained that Trujillo did not include Plaintiff's March activities in the IAD's March Activity Report.[44] Plaintiff also complained that Trujillo disclosed, in the March Activity Report, that Plaintiff was on FMLA leave in March of 2020.[45] In that Activity Report, Trujillo stated that he had assumed all duties of the Deputy Chief Auditor.[46]

Fifth, Plaintiff complained that Trujillo embarrassed him to the IAC in April 2020.[47] Plaintiff said that Trujillo had asked him to pay two invoices for the Department, and that Plaintiff told Trujillo that he would do so when he went into the department's office the next day.[48] While at the office to pay those invoices, Plaintiff says he received new laptops for the IAD staff and subsequently delivered them to all staff members except one, who was also in the office that day.[49] After delivering the laptops, Plaintiff said that he emailed Trujillo to

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] Pl.'s 56(a) ¶ 36.

[47] Pl.'s Third HR Complaint, ECF No. 77-10 at 3.

[48] *Id.*

[49] *Id.*

notify him that all staff members had their new laptops.[50] Plaintiff said that, a few minutes later, Trujillo replied to that email to say that he did not condone Plaintiff's going into the office due to the COVID-19 pandemic.[51] Plaintiff said that Trujillo copied the IAC on that email.[52] Plaintiff did not suffer any consequences as a result of Trujillo's email.[53]

Sixth, Plaintiff complained that someone, who he believed was Trujillo, had created a template for an audit evaluation to send to the City's department heads.[54] Requesting audit evaluations was a practice that had been discontinued since November of 2017.[55]

Seventh, Plaintiff complained that Trujillo sent out the IAD's April Activity Report without asking Plaintiff about his contributions to the Department, his meetings, or his trainings.[56] No trainings, for any staff member, were included in the April Activity Report.[57] Preparing the monthly activity reports was a responsibility that was formerly Plaintiff's, but one that Trujillo had assumed since Plaintiff took his FMLA leave in March, 2020.[58]

Eighth, Plaintiff complained that, on June 3, 3020, Trujillo had issued an audit report and copied the IAD Auditors on the message, but did not copy Plaintiff.[59]

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] Pl.'s 56(a) ¶ 39.

[54] *Id.* ¶ 40.

[55] Pl.'s Third HR Complaint, ECF No. 77-10 at 3.

[56] Pl.'s 56(a) ¶ 41.

[57] *Id.* ¶ 42.

[58] *See id.* ¶ 43.

[59] *Id.* ¶ 45.

Ninth, Plaintiff complained that Trujillo issued the IAD's May Activity Report to the IAD Auditors and the IAC but did not send it to Plaintiff.[60] The May Activity Report included Plaintiff's contributions to the Department.[61]

Tenth, Plaintiff complained that Trujillo prepared the audit plan for the 2021 fiscal year.[62] Trujillo had prepared the initial draft of the audit plan, Plaintiff then reviewed it, and Trujillo made changes to it based on Plaintiff's feedback.[63] Plaintiff had prepared the audit plans for the previous three fiscal years.[64]

After receiving Plaintiff's June 9 complaint, the City retained Kainen, Escalera and McHale, P.C. to investigate Plaintiff's claims.[65] Attorney Jennifer Dixon from the firm performed the investigation.[66] On July 23, 2020, Attorney Dixon issued a report of her investigation.[67] She concluded that that none of the behavior Plaintiff complained of constituted "actionable retaliation as a matter of law, and no violation of City retaliation policies was found."[68]

---

[60] *Id.* ¶ 46.

[61] *Id.* ¶ 47.

[62] *Id.* ¶ 48.

[63] *Id.*

[64] *Id.*

[65] *Id.* ¶ 49

[66] *Id.*

[67] *See* Dixon Report, ECF No. 77-11 at 18.

[68] *Id.*

### 5.    Caruso's August Meetings with Human Resources

On August 7, 2020, Plaintiff spoke with HR employee Thulani LeGrier about Trujillo.[69] LeGrier asked Plaintiff whether he was willing to "let bygones be bygones."[70] Plaintiff could not answer the question, so LeGrier gave him the weekend to think about it.[71]

On August 10, 2020, Plaintiff and LeGrier met again.[72] Plaintiff told LeGrier that he hated Trujillo and was not prepared to forgive him.[73] The parties agree that, in that conversation, Plaintiff also said something about punching Trujillo in the jaw.[74] However, they disagree about whether Plaintiff seriously meant that he wanted to punch Trujillo, or whether he was merely expressing how Trujillo's actions made him feel.[75]

In that August 10 meeting, Plaintiff also requested that he either be allowed to work from home or be relocated to another part of the building, away from Trujillo.[76] LeGrier told Plaintiff that he would need a doctor's note for that request to be granted.[77]

---

[69] Pl.'s 56(a) ¶ 60.

[70] *Id.* ¶ 61.

[71] *Id.*

[72] *Id.* ¶ 62.

[73] *Id.*

[74] *See* Pl.'s 56(a) ¶ 63; Pl.'s Dep., ECF No. 77-3 at 182:10–14.

[75] *See* Pl.'s 56(a) ¶ 63.

[76] Pl.'s 56(a) ¶ 64.

[77] *Id.*

**6.    Caruso's Efforts to Work from Home and LeGrier's Internal Memo**

Following the August 10 meeting, Plaintiff delivered a note in support of his request to work from home from Dr. Edelheit to the City and LeGrier.[78] The note said that that "[i]t would be in the best interest, from a medical standpoint, that Joseph Caruso be allowed to work remotely from his home on a full time basis until the time his supervisor separates from his current employment."[79] When he delivered the note to LeGrier, LeGrier asked Plaintiff "what [he] was supposed to do" with it.[80] LeGrier also suggested that Plaintiff fill out some "accommodation paperwork."[81] At no time after that did Plaintiff apply for FMLA leave.[82]

Then, on August 27, City Benefits Administrator Rich Pokorski sent a letter to Plaintiff telling him that more medical paperwork would be required if Plaintiff was claiming a disability that required accommodation.[83] A few days later, Plaintiff delivered a Medical Certification Form completed by Dr. Edelheit to the City.[84] Dr. Edelheit represented that Plaintiff's anxiety and panic attacks rendered him unable to perform the "essential function" of "reporting to direct supervisor [and] comission [sic] members" for "3-6 months."[85]

---

[78] *Id.* ¶¶ 65, 67.

[79] *Id.* ¶ 65; Edelheit's Aug. 11 Note, ECF No. 77-13 at 2.

[80] Pl.'s 56(a) ¶ 67.

[81] *Id.*

[82] *Id.* ¶ 68.

[83] *Id.* ¶ 70.

[84] *Id.* ¶ 72.

[85] Medical Certification Form, ECF No. 77-15 at 2–4; *see also* Pl.'s 56(a) ¶ 72.

On September 8, 2020, Pokorski sent another letter to Plaintiff saying that the City needed more information regarding what accommodation, if any, would allow Plaintiff to perform the essential functions of his position.[86]

On September 16, 2020, Pokorski also sent a letter to Dr. Edelheit asking whether it was the doctor's opinion that it was "only in-person reporting/communication with the direct supervisor and commission members that exacerbates [Plaintiff's] condition."[87] The letter also asked whether it was Dr. Edelheit's opinion that Plaintiff's condition would resolve in three to six months, and thereby allow Plaintiff to resume in-person reporting at that time.[88]

Dr. Edelheit responded to Pokorski's letter by returning a copy of it with some words underlined, a circle drawn, and a handwritten message which read, "I would agree to this but ask pt if he also agrees. The concept is that his anxiety will improve in 3-6 mo."[89]

While this back-and-forth was happening, Plaintiff was working remotely with Pokorski's permission.[90] Additionally, on August 28, 2020, LeGrier had prepared and sent to Trujillo an "early warnings signs" memo.[91] In that memo, LeGrier told Trujillo that Plaintiff

---

[86] Pl.'s 56(a) ¶ 76.

[87] Pokorski's Sep. 16 Letter, ECF No. 77-19 at 2. Plaintiff seems to deny the City's characterization of Pokorski's words, but admits that the letter "asks whether if [sic] only in person reporting exacerbates his condition when that that [sic] will resolved [sic] in three to six months." Pl.'s 56(a) ¶ 77.

[88] Pokorski's Sep. 16 Letter, ECF No. 77-19 at 2.

[89] Edelheit Sep. 29 Reply, ECF No. 77-20, at 3; *see also* Pl.'s 56(a) ¶ 78.

[90] *See* Pl.'s 56(a) ¶¶ 74, 76.

[91] LeGrier Memo, ECF No. 77-16; *see also* Pl.'s 56(a) ¶ 71.

had made a comment about punching Trujillo, and that Trujillo and the rest of the IAD should avoid coming into the office.[92]

### 7. Caruso's October Meeting with Human Resources

On October 9, 2020, Plaintiff met virtually with LeGrier and Melvin Gonzalez, another representative from Human Resources, to discuss the status of Plaintiff's employment and the ADA accommodation paperwork.[93] Following the meeting, Plaintiff was disconnected from the IAD network and placed on leave.[94]

On January 20, 2021, Plaintiff received from LeGrier a written notice of his "non-disciplinary," "administrative separation from employment," effective January 15.[95]

### B. Procedural Background

Caruso filed the instant action on November 3, 2022, claiming a violation of the Fourteenth Amendment's Due Process Clause, discrimination, hostile work environment, failure to accommodate, retaliation, violation of the Family and Medical Leave Act, and state-law discrimination causes of action.[96] The City moved for summary judgment as to all of Plaintiff's claims.[97] Caruso filed an opposition and the City filed a reply.[98]

---

[92] LeGrier Memo, ECF No. 77-16.

[93] Pl.'s 56(a) ¶ 81.

[94] *Id.* ¶ 83.

[95] Separation Notice, ECF No. 77-21.

[96] *See* SAC, ECF No. 20 at 7–14.

[97] Def.'s Mot., ECF No. 77.

[98] Pl.'s Opp., ECF No. 99; Def.'s Reply, ECF No. 100.

## II.  <u>LEGAL STANDARD</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is not genuine issue as to any material fact and it is clear the moving party is entitled to judgement as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *Id.* The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). However, if the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof and submits "merely colorable evidence," then summary judgment is appropriate. *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may

not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). There must be evidence on which the jury reasonably could find for it. *Dawson v. Cnty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

## III.   DISCUSSION

### A.   Fourteenth Amendment Due Process Claim

The City moves for summary judgment with respect to Caruso's constitutional due process claim on the ground that Caruso has not established a cognizable interest in continued employment. Even if Caruso had a property interest in his position, the City argues, Caruso's claim nonetheless fails because the City provided him with adequate notice and an opportunity to be heard prior to his separation. As discussed below, because the Court holds that summary judgment is warranted on the basis that Caruso has not presented evidence of a protected interest that was deprived, it does not reach the issue of whether Caruso was afforded the process he was due.

Under the Due Process Clause of the Fourteenth Amendment, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012). Property interests "cannot be found on the face of the Constitution, but rather 'are created[,] and their dimensions are defined by[,] existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits.' " *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (quoting *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577

(1972)). "The issue of whether an individual has such a property interest is a question of law[.]" *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994).

Caruso identifies the Hartford Municipal Code ("HMC") as providing him with a property interest in continued employment as deputy chief auditor of the City's internal audit unit (the "IAU").[99] Caruso identifies four theories upon which there are genuine disputes of material fact as to whether the City violated his due process rights. First, relying on HMC Section 2-41.1(c), Plaintiff argues that he was fired by the human resources department staff, as opposed to the director of the IAU or the three-member IAC. Second, relying on HMC Section 2-410(C)(1), Plaintiff argues that he was not provided with advance written notice of the detailed reasons for his termination. Third, relying on HMC Sections 2-410(C)(2) and 2-440, Plaintiff argues that he was deprived of the right to appeal because no appeal period was triggered due to the invalid letter provided from the City's human resources department. Fourth, relying on HMC Section 2-410(C)(2), Plaintiff argues that being administratively separated is not an option to terminate his employment.

When viewed through the proper lens, the HMC does not support Plaintiff's contention that he has a property interest in continued employment. "A public employee who may be dismissed **only** for just cause has a property right in his employment. *Faghri v. Univ. of Conn.*, 621 F.3d 92, 99 (2d Cir. 2010) (emphasis added). Where, by contrast, the source of an alleged property right "provides a **discretionary** course of action for employers[,]" there is not a constitutionally protected property interest. *Jannsen v. Condo*, 101 F.3d 14, 16 (2d Cir. 1996) (emphasis added) ("This section does not mandate the employer to grant a leave of absence

---

[99] Pl.'s Opp. at 9–11.

and a corresponding hearing, but rather permits the procedure."). Here, the term "may," as used in Sections 2-41.1 and 2-410 of the HMC, indicates "permissive conduct and the conferral of discretion." *Lostritto v. Cmty. Action Agency of New Haven, Inc.*, 848 A.2d 418, 424–25 (Conn. 2004) (citing *Comm'n on Hum. Rts. & Opportunities v. Truelove & Maclean, Inc.*, 680 A.2d 1261, 1268 (Conn. 1996)). The HMC provides, in relevant part, that "Staff of the [IAU] shall be members of the classified service and, subject to the rules of the classified service, shall be appointed and **may** be removed by the chief auditor." HARTFORD, CT., MUNICIPAL CODE ch. 2, art. II, § 2-41.1(c) (emphasis added).  The HMC also provides that "An employee **may** be separated from the service of the City by any one (1) of the procedures set forth in this section[,]" which includes procedures for resignations, lay-offs, and dismissal. *Id.* ch. 2, art. VI, div. 9, § 2-410 (emphasis added). Additionally, Section 2-410's requirement for the City to provide notice to an employee of the reasons for discharge within a time certain, standing alone, does not create a property interest. *See id.* ("No Dismissal of a Classified Employee shall take effect unless five (5) working days prior to the effective date thereof, the Appointing Authority shall give to such employee a written statement setting forth in detail the reasons and file a copy of such statement with the Director."); *see also Esposito-Cogan v. East Haven Bd. of Educ.*, No. 07-CV-681, 2009 WL 839015, at *4 (D. Conn. March 30, 2009) (citing *Goetz v. Windsor Ctr. Sch. Dist.*, 698 F.2d 606, 609 (2d Cir. 1983) ("The mere fact that an employer may be required to notify an employee of the reasons for discharge does not alter the employee's status as an at-will employee.")). Therefore, when properly understood, while Section 2-41.1(c) permits the City's chief auditor to remove Plaintiff from his employment and Section 2-410 permits the City to terminate Plaintiff from his employment through

prescribed procedures for layoff or dismissal, the statutory text does not create a property interest in continued employment.

Moreover, that the HMC provides for a time period to appeal hearing does not bear on whether Plaintiff possesses a property interest. The HMC provides that "[a]ny Classified Employee who is dismissed, demoted, or suspended may appeal, in writing, to the Director within five (5) working days of the date of such notice" and it sets forth procedures for that appeal:

> In the case of appeal, within not less than five (5) or more than ten (10) working days after the date of notice of such Dismissal, Demotion, or Suspension, the Human Resources Board of Appeals shall hold a hearing and notify by registered or certified mail both the Appointing Authority and employee involved of the time and place.

*Id.* ch. 2, art. VI, div. 12, § 2-440(A) (emphasis added). However, the plain text of the ordinance does not confer a protected property interest, as it does not require "just cause" to terminating Caruso's employment. Because "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion," Plaintiff has not shown a constitutionally protected interested in continued employment. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005); s*ee also N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 164 (2d Cir. 2001) ("Where a purported property interest is contingent on the exercise of executive discretion, no legitimate claim of entitlement exists. A constitutionally protected interest cannot arise from relief that the executive exercises unfettered discretion to award." (cleaned up)).

Accordingly, for the above reasons, the Court grants summary judgment to the City on the due process claim.

**B.**    **Failure to Accommodate Claims**

The City moves for summary judgment on the ground that Caruso cannot establish a *prima facie* case of disability discrimination for failure to accommodate. Specifically, the City asserts that Plaintiff could not perform an essential function of his job, reporting to his direct supervisor and the IAC members.

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). "In so-called reasonable-accommodation cases, such as this one, the plaintiff's burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) (quotation marks omitted). "The burden of persuasion then shifts to the defendant to rebut the reasonableness of the proposed accommodation," which is "in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the employer to suffer an undue hardship." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 190 (2d Cir. 2015) (cleaned up).

Here, the City does not argue that the first and fourth elements of the *prima facie* case are not satisfied. Rather, the City argues that it did not have notice of Plaintiff's disability prior

to his leave of absence in late February 2020 and that Plaintiff could not perform an essential function of his position."[100]

As an initial matter, Defendant's contention that the City did not initially have notice of Plaintiff's disability does not relevantly affect the Court's analysis. A reasonable jury could find the City was on notice as of August 2020, when Plaintiff, in response to the City's request for additional paperwork to support Plaintiff's claim of disability, provided a Medical Certification Form, which represented that Plaintiff's anxiety and panic attacks rendered him unable to perform the "essential function" of "reporting to direct supervisor [and] comission [sic] members" for "3-6 months."[101]

There is sufficient evidence from which a jury could find that Plaintiff established the remaining element—that Plaintiff could fulfill the essential functions of the job—to make a *prima facie* showing for a discrimination claim arising from a failure to accommodate. While the City asserts that Caruso could not fulfill the essential function of reporting to his supervisor, Jason Trujillo and the IAC members, the record shows Caruso doing so when he worked remotely following his return from FMLA Leave in March 2020. Plaintiff indicates that the members of the IAC were all working remotely because of the COVID-19 pandemic and that, at all times, Plaintiff was able to report to his supervisor and co-workers either in person or remotely.[102] Additionally, the City told Caruso to continue to work remotely following his request for an accommodation.[103] Considering that "[p]hysical presence at or by a specific time

---

[100] Def.'s Reply, ECF No. 100 at 4–5.

[101] Medical Certification Form, ECF No. 77-15, at 2–4.

[102] Caruso Aff., ECF No. 99-5 ¶ 29.

[103] Def.'s 56(a) ¶¶ 26, 74; Caruso Aff. ¶ 30.

is not, as a matter of law, an essential function of all employment," and how Caruso's job was "actually performed in practice," the Court finds that genuine disputes remain as to whether Caruso could perform the essential functions of the job at issue. *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013).

Accordingly, for the above reasons, the Court denies summary judgment on the failure to accommodate claim under the ADA. And because Defendant only moves for summary judgment of Plaintiff's CFEPA claims for the same reason as his federal claims, summary judgment must be denied.

### C.    Disability Discrimination Claims

The City moves for summary judgment with respect to Caruso's ADA claim on the ground that he cannot establish a *prima facie* case of disability discrimination for terminating his employment. Specifically, the City asserts that Caruso could not perform an essential function of his job and that, even if he established a *prima facie* case, Caruso has not presented evidence that the City's proffered reason for separating his employment was merely a pretext for discrimination.

"To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020). "Once a plaintiff has established a *prima facie* case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). To rebut the

presumption, "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge," and if that happens, to survive summary judgment, "the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). To show pretext, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). "[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008).

Here, as noted previously, the City neither contests that it is subject to the ADA nor that Caruso is disabled. Rather, the City argues that Caruso could not perform an essential function of his position and that there is no evidence of discriminatory animus, much less evidence to establish that the administrative separation would not have occurred but-for his disability."[104]

There is sufficient evidence from which a jury could find that Caruso established a *prima facie* disability discrimination claim for the termination of his employment. As noted above, genuine disputes remain as to whether Caruso could perform the essential functions of the job at issue. Therefore, the plaintiff need only produce "minimal evidentiary support for

---

[104] Def.'s Reply, ECF No. 100 at 4-5.

the claim of discriminatory motivation." *Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). The evidence supporting the claim of discriminatory motivation comes from the October 2020 meeting, where City employees discussed Caruso's disability accommodation paperwork and subsequently Caruso was placed on leave. To recap, in August 2010, Plaintiff delivered a note in support of a request to "work remotely from his home on a full-time basis until the time his supervisor separates from his current employment."[105] Then in August 2020, the City sent Caruso a letter explaining that if he is claiming a disability for which he needed an accommodation then additional medical paperwork was required, to which Plaintiff delivered a Medical Certification Form completed by Dr. Edelheit to the City.[106] Then in October 2020, Caruso met with human resources where an employee told the plaintiff that the disability accommodation request represented a resignation that the City gladly accepted.[107] Caruso was then placed on leave and then, in January 2021, Caruso received a written notice of his "non-disciplinary," "administrative separation from employment," effective January 15.[108] Because the comment related to Caruso's disability accommodation request was made during a meeting that resulted in Caruso being placed on leave and predated his termination by a few months, there is a "sequence of events leading to the plaintiff's discharge" that

---

[105] Pl.'s 56(a) ¶¶ 65, 67.

[106] *Id.* ¶¶ 70, 72.

[107] Pl.'s Dep. at 217:2-15 (Q: And what do you recall Thulani saying to you regarding the ADA issue? A:[] it kind of went into the fact that this represents a resignation and that the City gladly accepts. Q: And did he indicate why he viewed this as a resignation? A: He might have -- he might have said something along the lines of how it was written in terms of reporting to the supervisor or the Commission. He might have said that.).

[108] Separation Notice, ECF No. 77-21.

contribute to a permissible inference of discriminatory intent. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

Even if the City asserted a legitimate, non-discriminatory reason for separating Caruso's employment, there is sufficient evidence from which a jury could find that the reason stated was pretextual. Caruso testified that, prior to being placed on leave, a human resources employee told him that the disability accommodation request represented a resignation that the City gladly accepted.[109] In considering whether the remark is probative of discriminatory intent, the Court considers "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). Where, as here, a human resources employee made a remark that explicitly references a disability accommodation request (and implicitly, the employee's disability) at a meeting in close proximity to the employee's termination, that remark is strong evidence of discriminatory intent. A reasonable factfinder could thus conclude that but for Caruso's disability, the City would not have terminated his employment.

Accordingly, for the above reasons, the Court denies summary judgment with respect to the disability discrimination claim under the ADA. And because Defendant only moves for summary judgment of Plaintiff's CFEPA claims for the same reason as his federal claims, summary judgment must be denied.

---

[109] Pl.'s Dep. at 217:2-15.

### D.    Hostile Work Environment Claim

The City moves for summary judgment with respect to Caruso's hostile work environment claim on the ground that Caruso cannot establish that he was subjected to an abusive working environment because of his claimed disability.

Caruso does not address in his opposition whether he has presented evidence to show that genuine disputes remain for the hostile work environment claims. The Court therefore finds that Plaintiff has abandoned the hostile work environment claims. *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (affirming finding that plaintiff's hostile work environment claims were abandoned where plaintiff failed to argue that they should survive summary judgment). Even if Caruso has not abandoned these claims, the Court holds that no reasonable jury could find that there was a hostile work environment.

To sustain his burden on a hostile work environment claim, a plaintiff must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). "Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the plaintiff's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Here, Plaintiff has neither presented evidence to raise a material issue of fact that there was sufficiently severe or pervasive harassment with a nexus to discriminatory animus. *Tolbert*

*v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) ("It is axiomatic that the plaintiff must also show that the hostile conduct occurred because of a protected characteristic."). Therefore, after considering the totality of the circumstances in the light most favorable to Plaintiff, the Court must conclude that Defendant is entitled to summary judgment.

Accordingly, for the above reasons, the Court grants summary judgment to the City on the hostile work environment claim.

### E.    Retaliation Claims

The City moves for summary judgment of Caruso's retaliation claims on the ground that Caruso cannot establish a *prima facie* case and, even if he did, the City had a legitimate, non-retaliatory reason for terminating his employment.

### 1.    ADA and CFEPA

Retaliation claims under federal and state law are analyzed under the burden-shifting framework described in *McDonnell Douglas*, 411 U.S 802–04. *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). To establish a *prima facie* case of retaliation under the ADA and CFEPA sufficient to withstand summary judgment, it must be shown that "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (ADA); *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019) (CFEPA). Once a plaintiff establishes the *prima facie* case, the burden shifts to a defendant to proffer a "legitimate, nonretaliatory reason for the challenged employment decision," whereupon the burden shifts back to a plaintiff to

demonstrate that the rationale is "merely a pretext for impermissible retaliation." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

There is sufficient evidence from which a jury could find that Caruso established a *prima facie* retaliation claim under the ADA and CFEPA related to the City terminating his employment. Requesting a disability accommodation is an activity protected by the ADA. *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002); *see also Armstrong v. Aura Healthcare, LLC*, No. 24-CV-723, 2025 WL 357839, at *7 (D. Conn. Jan. 31, 2025). As to the first and second elements of the *prima facie* case, a reasonable factfinder could infer that the City was aware that Caruso engaged in a protected activity when, in August 2010, Caruso delivered a note in support of a request to "work remotely from his home on a full-time basis until the time his supervisor separates from his current employment."[110] After receiving the note, Caruso was told to fill out some "accommodation paperwork."[111] Later in August, the City sent Caruso a letter explaining that if he needed an accommodation then additional medical paperwork was required.[112] On August 31, 2020, Caruso delivered a Medical Certification Form completed by Dr. Edelheit to the City.[113] As to the third and fourth elements, in October 2020, following a meeting with LeGrier and another representative from HR where they discussed the ADA accommodation paperwork, Plaintiff was placed on leave.[114] Then, in January 2021, Caruso received from LeGrier a written notice of his "non-

---

[110] Pl.'s 56(a) ¶¶ 65, 67.

[111] *Id.*

[112] *Id.* ¶ 70.

[113] *Id.* ¶ 72.

[114] Pl.'s 56(a) ¶¶ 81, 83.

disciplinary," "administrative separation from employment," effective January 15.[115] The close temporal proximity, of approximately three months, between the request for an accommodation and the plaintiff's administrative separation is sufficient to establish a causal connection to support a retaliation claim. *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001) (holding that four months between a protected activity and an adverse action was "sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion").

Even if the City asserted a legitimate, non-retaliatory reason for separating Caruso's employment, there is sufficient evidence from which a jury could find that the reason stated was pretextual. A plaintiff must proffer evidence to "prove that the desire to retaliate was the but-for cause of the challenged employment action," *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (quotation marks omitted), which can be done "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). Caruso testified that, prior to being placed on leave, a human resources employee told him that the disability accommodation request represented a resignation that the City gladly accepted.[116] The explicit reference to the disability accommodation request prior to Caruso's administrative separation is "strong direct evidence" that the City was driven by retaliatory intent. *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 277 (2d Cir. 2023). Therefore, a

---

[115] Separation Notice, ECF No. 77-21.

[116] ECF No. 77-3 at 217:2-15.

reasonable factfinder could conclude that but for Plaintiff's request for a disability accommodation, the City would not have terminated his employment.

## 2.    FMLA

To establish a *prima facie* case of retaliation under the FMLA sufficient to withstand summary judgment, it must be shown that "(1) [a plaintiff] exercised rights protected under the FMLA; 2) [a plaintiff] was qualified for his position; 3) [a plaintiff] suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). If an employer meets the burden to demonstrate a legitimate, non-discriminatory reasons for the adverse employment action, then the burden shifts to the plaintiff to show that the proffered reason was pretextual, "and that the plaintiff's use of FMLA leave was a motivating factor in the adverse employment decision." *Khan v. ELRAC, LLC*, No. 23-CV-3, 2024 WL 1344694, at *3 (D. Conn. Mar. 29, 2024) (quoting *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 165 (2d Cir. 2017)).

There is sufficient evidence from which a jury could find that Plaintiff established a *prima facie* retaliation claim under the FMLA related to the City reducing Plaintiff's job responsibilities following his return from protected leave. The FMLA provides qualified employees with 12 workweeks of unpaid leave per year for personal matters, including for a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  Here, Caruso commenced FMLA leave on February 28, 2020 and then returned to work approximately four weeks later.[117] When

---

[117] Pl.'s 56(a) ¶¶ 17, 24.

Caruso returned to work on March 26, 2020, Trujillo advised him that audit reports which he was responsible for managing while Caruso was out on leave would continue under Trujillo's management.[118] Plaintiff complained that, after informing Trujillo of his return to work, Trujillo responded with "All audits and reports in progress are under my management and you do not need to be involved in them."[119] Plaintiff also complained that, in June 2020, Trujillo repeatedly sent audit reports to coworkers without including him on the emails.[120]  The close temporal proximity, of approximately three months, between a plaintiff exercising his rights under the FMLA and the reduction in the plaintiff's job responsibilities is sufficient to establish a causal connection to support a retaliation claim. *Gorman*, 252 F.3d at 555. Because the City failed to satisfy the burden of producing admissible evidence sufficient to articulate a legitimate non-retaliatory explanation for the reduction in Plaintiff's responsibility, summary judgment must be denied. *Hannah v. Wal-Mart Stores, Inc.*, No. 3:12-CV-01361 (VAB), 2016 WL 554771, at *18 (D. Conn. Feb. 11, 2016) (denying summary judgment where a defendant did not state a legitimate, non-retaliatory reason).

Accordingly, for the above reasons, the Court denies summary judgment on the retaliation claims.

### F.    FMLA Interference Claim

The City also moves for summary judgment of Plaintiff's FMLA claim on the ground that Caruso cannot establish interference.

---

[118] Pl.'s 56(a) ¶ 33.

[119] Pl.'s Third HR Complaint, ECF No. 77-10.

[120] Pl.'s 56(a) ¶¶ 45, 46.

Plaintiff does not address in his opposition whether he has presented evidence to show that genuine disputes remain for the FMLA claims. The Court therefore finds that Plaintiff has abandoned the FMLA claims. *Leftridge v. N.Y. City Dep't of Educ.*, No. 17-CV-7027, 2020 WL 1503665, at *11 (S.D.N.Y. Mar. 30, 2020) (deeming FMLA claim to be abandoned where a plaintiff "did not dispute Defendants' assertions in his opposition to their summary judgment motion"); *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

Even if Caruso has not abandoned this claim, the Court holds that no reasonable jury could find that in favor of Caruso on the FMLA claim. "[T]o prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). Here, Caruso took FMLA leave, returned early from his leave, and did not request any additional leave. No reasonable jury could find that Caruso was denied FMLA benefits to which he was entitled.

Accordingly, for the above reasons, the Court grants summary judgment to the City on the FMLA interference claim.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion for summary judgment is **granted** with respect to Plaintiff's due process, hostile work environment, and FMLA interference

claims. Summary judgment is **denied** with respect to Plaintiff's failure-to-accommodate, disability discrimination, and retaliation claims.

**SO ORDERED.**

Hartford, Connecticut
September 23, 2025

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge